UNITED STATES *v.* WESTERN COMMERCIAL Co. (No. 3545)[1]

[1] T. D. 46040.

United States Court of Customs and Patent Appeals, November 30, 1932

*Charles D. Lawrence,* Assistant Attorney General (*William H. Futrell,* special attorney, of counsel), for the United States.
*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellee.

[Oral argument October 7, 1932, by Mr. Lawrence and Mr. Brown]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, holding that certain imported cotton cloth, closely woven, in the gray, not bleached, printed, dyed, colored, or woven-figured, was dutiable at the appropriate rate under the following provisions of paragraph 903 of the Tariff Act of 1922:

PAR. 903. Cotton cloth, not bleached, printed, dyed, colored, or woven-figured, containing yarns the average number of which does not exceed number 40, forty one-hundredths of 1 cent per average number per pound; exceeding number 40, 16 cents per pound and, in addition thereto, fifty-five one-hundredths of 1 cent per average number per pound for every number in excess of number 40: *Provided,* That none of the foregoing, when containing yarns the average number of which does not exceed number 80, shall pay less duty than 10 per centum ad valorem and, in addition thereto, for each number, one-fourth of 1 per centum ad valorem; nor when exceeding number 80, less than 30 per centum ad valorem.

The involved merchandise was assessed for duty by the collector at the port of New York as waterproof cloth at 5 cents per square yard and 30 per centum ad valorem, under paragraph 907 of that act, which reads as follows:

PAR. 907. Tracing cloth, 5 cents per square yard and 20 per centum ad valorem; cotton window hollands, all oilcloths (except silk oilcloths and oil-

cloths for floors), and filled or coated cotton cloths not specially provided for, 3 cents per square yard and 20 per centum ad valorem; waterproof cloth com posed wholly or in chief value of cotton or other vegetable fiber, whether or not in part of india rubber, 5 cents per square yard and 30 per centum ad valorem.

It appears from the record that the involved merchandise, in pieces 50 feet in length and 15 feet in width, was imported in bales. It also appears that it had not been filled, coated, nor treated with any so-called waterproofing material.

The witness Paul Gross, testifying for the importer, stated that it was "not a part of his business to deal in waterproof cloth"; that the imported merchandise had not been filled "to resist water"; that he would not consider it "waterproof cloth"; that he did not deal in cotton fabric "that might be used for tent purposes"; that he was an importer "of supplies, mostly materials connected with the motion-picture industry"; that he had sold the imported and merchandise of like character for use in the manufacture of motion-picture screens; that it was particularly adaptable for that use due to its "seamless width"; that he did not deal in "sail cloth"; and that in the manufacture of the involved material into motion-picture screens it was cut to the desired size, painted, and coated, and that, when painted, the paint seeped through the cloth.

The witness Ludwig A. Wilczek, testifying for the importer, said that, at the time his testimony was given, he was in the screen-importing business; that he had previously been in the business of manufacturing projection screens; that he had purchased material like that involved from the witness Gross and had used it for manufacturing motion-picture projection screens. In connection with his use of the involved merchandise, he said:

A. We cut the screens to the size required for the moving-picture screens. They were covered in the front with a spray of two or three layers of white paint, and then a layer of white enamel in which was embedded glass beads.

Q. These glass beads are embedded in the enamel?—A. When the enamel reaches a certain stickiness and before it completely dries, glass beads are embedded in the enamel.

Q. What did you do then?—A. In the rear of the screen, when we have put on the paint in the front, we brush immediately all the paint that seeps through to make an even surface both in the front and in the back, and that surface in the back which is white is usually covered then with a black paint.

Q. The back of the screen has an additional coat of black paint?—A. The first coat that is applied to the front seeps through to the back and a coat of black paint is put over the white on the back.

He also stated that he did not know whether the imported merchandise was waterproof.

The importer's witness Nathaniel Schneider stated that he was connected with the Schneider-Scenic Studios, New York, manufac-

turers of scenery and draperies for the stage. With reference to the processing of material like that here in issue he stated:

Q. Is this material washed?—A. It is first sized with starch.
Q. What is the purpose of that?—A. To close up the weave.
Q. To fill in the pores in the material?—A. Yes, sir.
Q. What is the purpose of filling in the pores?—A. That is done to have the water color stick to the painting.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Just state what was done to this material by your concern.—A. We make our sizing first and fill up the cloth so that we have a solid surface for painting. That is done on all painting materials.

The witness further said that waterproof material was a greasy substance and that it was not, and could not be, used by his company in the manufacture of projection screens because—

You could not apply the paint to it; you could not cover it; it would seep through. You can not apply the paint to any greasy substance.

The Government submitted the testimony of but one witness, Henry A. Gassmann, a Government analyst. He stated that he had made certain tests of the involved material in order to determine whether it was waterproof. We quote:

A. I made two tests. The first test I made was the cup test, which was to make an indentation in the sample in cup form and put it into a beaker. That test was made at 9.15 a. m. on January 23 to 9.20 a. m. January 24—in other words, an exposure of 24 hours—and there was absolutely no water in the beaker. The cloth was impervious to water. I made the second test on January 30, a so-called drip test, a very severe test, which has been abandoned by the Royal Research Bureau in London as being too severe. But I made the test for an hour and 15 minutes, and I found that the underside of the cloth was only slightly moist.

Judge FISCHER. Explain that test.

The WITNESS. The cloth is put on a frame and it is set up at 45 degrees and the water is allowed to drip on, about a 10-inch drop, so that is a very severe test.

Judge FISCHER. Yes. It did not penetrate, but it was just slightly moist?

The WITNESS. Just slightly moist. And from a confirmatory test I would call it waterproof.

Judge FISCHER. Did you find any cotton in there?

The WITNESS. Nothing but cotton.

Judge FISCHER. No waterproofing material?

The WITNESS. Well, it didn't look to be that.

Judge FISCHER. Did you ever examine sail cloth?

The WITNESS. Sail cloth sheds the water. They can't use sail cloth if it absorbs water; it might make the ship top-heavy.

Judge FISCHER. Won't it turn water as much as this piece?

The WITNESS. No, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The WITNESS. The ordinary test [for determining whether cloth is waterproof] is simply made by taking the cloth and holding it over the hand, and if it sheds the water entirely, it is waterproof. If it isn't waterproof it will absorb it; and if this was treated in any way it would absorb.

The court below, in an opinion by Kincheloe, J., Tilson, J., dissenting, held that under the facts of record the involved merchandise was not waterproof cloth, as that term had been defined by this court in the case of *United States* v. *Hudson Forwarding & Shipping Co.*, 18 C. C. P. A. (Customs) 258, T. D. 44427. We there said:

* * * We do not think that Congress intended that cloth which was not in its manufacture designed to repel or turn water in use, or cloth that is not suitable for such use, should be included in the term "waterproof cloth" found in said paragraph 907. If, in the manufacture of the cloth, its being rendered impervious to water is merely an incidental result, without any intent or design to make it waterproof for the purpose of repelling or turning water, and it is not suitable for such use, it is, in our opinion not "waterproof cloth" within the meaning of said paragraph.

The court also cited the case of *United States* v. *E. Dillingham (Inc.)*, 19 C. C. P. A. (Customs) 210, T. D. 45297.

It is contended by counsel for the Government that the court below erred in considering the use of the involved merchandise; that, as the cloth is substantially impervious to water, it is "waterproof cloth" within the meaning of the provisions contained in paragraph 907, regardless of the uses for which it was designed or intended. Counsel for the Government further contends, however, that, if its use is an element to be considered in determining whether it is waterproof cloth, the importer has wholly failed to establish that it is not suitable for use as material for articles designed to repel or turn water.

Counsel for appellee, on the other hand, contends that the testimony of record established that the involved merchandise, although substantially impervious to water, was not suitable for use as sail cloth nor for tent making; that, as it appears that it was used in the manufacture of motion-picture projection screens, the case is controlled by our decision in the *Hudson Forwarding & Shipping Co.* case, *supra;* and that, therefore, the judgment should be affirmed.

In the case of *United States* v. *Hudson Forwarding & Shipping Co.*, *supra*, and again in the case of *United States* v. *E. Dillingham (Inc.)*, *supra*, this court considered the provisions of paragraph 907 in connection with its legislative history and held that it was intended by the Congress to include in that paragraph, unless more specifically provided for elsewhere—

cotton cloth substantially impervious to water and intended to repel or turn water or suitable for use [commercially, of course] as material for articles designed to repel or turn water.

The involved merchandise having been classified by the collector as waterproof cloth, composed wholly or in chief value of cotton, the burden was upon the importer on the trial below to establish that it was not waterproof cloth within the principles hereinbefore set forth.

It has been established by the Government that the imported cloth is substantially impervious to water. It is true that it has not been treated with any waterproofing material, and that its waterproof character is entirely due to the fact that it is a closely woven fabric. However, it is clear from the legislative history, referred to in the *Hudson Forwarding & Shipping Co.* and *E. Dillingham (Inc.)* cases, *supra*, that the Congress did not intend to limit the provisions for waterproof cloth in paragraph 907 to such cloth as had been specially treated with waterproofing material.

In the Summary of Tariff Information, 1921, the Tariff Commission reported to the Finance Committee of the Senate that—

* * * Any cloth that is impervious to water, or that is substantially so and intended to turn water, may be classed as a waterproof cloth. Some fabrics invoiced as waterproof cloths and held to be so dutiable are simply close-woven cotton cloths which have undergone no special treatment; others are made by cementing together two cloths (such as the duplex fabric made of a printed cloth and a dyed cloth and used for raincoats) that are otherwise not waterproof. The waterproof cloths used in domestic trade have for the most part, however, been subjected to various finishing processes, the nature and extent of which are dependent on the service that is expected of the particular goods.

In the case of *United States* v. *Hudson Forwarding & Shipping Co.*, *supra*, it not only appeared from the testimony that the importer knew of no other use made of the imported cloth, outside of the trimming trade, but it also appeared, as held by this court, that the waterproof character of the cloth was but a mere incident of manufacture; that it would not stand a "reasonable amount of wear before water would pass through it"; and that, therefore, the importer had established *prima facie* that the cloth there imported was not substantially impervious to water, nor intended to repel or turn water, nor suitable for use as material for articles designed to repel or turn water.

In the case at bar, although the witness Gross, president of appellee's company, testified that appellee sold the involved and like merchandise for use in the manufacture of motion-picture screens, he did not say that he knew of no other uses for it. Furthermore, it has been established by the Government that the merchandise is substantially impervious to water. Accordingly, we must hold that the evidence is insufficient to establish that the involved cloth was not intended nor designed to repel or turn water, and that there is no evidence tending to establish that it is not commercially suitable for use as material for articles designed to repel or turn water.

Although the witness Gross testified that he did not deal in waterproof cloth, that statement is a mere conclusion and is not evidence of a fact upon which the involved issues might be determined. He also said that he would not regard the involved merchandise as waterproof cloth. However, no reasons were assigned for such belief, nor

is there any evidence of record to indicate that he was qualified to express an opinion on the subject having any probative force.

We are of opinion, therefore, that the issues in this case are clearly distinguishable from those in the *Hudson Forwarding & Shipping Co.* case, *supra*, and that they are controlled by our decision in the case of *United States* v. *E. Dillingham (Inc.), supra*.

For the reasons stated, the judgment is *reversed*.